✓ FILED ____ LODGED
____ RECEIVED ____ COPY

DEC 0 2 2009

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____DEPUTY

SEALED

1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

7

## DISTRICT OF ARIZONA

8

United States of America

9
Plaintiff,

10
v.

11
1)  Duane Hamblin Slade
    Counts 1 - 40

12

13
2)  Guy Andrew Williams
    Counts 1 - 40

14
3)  Brent F. Williams
    Counts 1 - 40

15

16
4)  Douglas Edward Towler
    Counts 1-3, 6-15, 19-36

17
5)  Russell Laurence Sewell
    Count 1

18

19
Defendants.

NO CR 09-1492-PHX-EHC (DKD)

**INDICTMENT**

VIO:  18 U.S.C. § 1349
      (Conspiracy)
      Count 1

      18 U.S.C. § 1341
      (Mail Fraud)
      Counts 2-5

      18 U.S.C. § 1343
      (Wire Fraud)
      Counts 6-18

      18 U.S.C. § 1957(a)
      (Transactional Money
      Laundering)
      Counts 19-40

      18 U.S.C. § 2
      (Aid and Abet)
      Counts 1-40

      18 U.S.C. § 981(a)(1)(C)
      18 U.S.C. § 982(a)(1)
      28 U.S.C. § 2461(c)
      (Forfeiture Allegations)

20

21

22

23

24

25

26

27

28

THE GRAND JURY CHARGES:

At all times material to this Indictment:

## DEFENDANTS

1.   DUANE HAMBLIN SLADE ("SLADE" or "DS"), was a resident of Mesa, Arizona. Starting at a time before the formation of Mathon Fund I, through on or about April 2005, he, along with others, operating through Mathon-related Entities, [1/] induced victims to "invest" funds, primarily in Mathon Fund I and/or Mathon Fund, with false promises that the defendants and others could earn high-yield rates of return by making short-term, high-interest hard money loans to borrowers, and through this fraudulent process he and others greatly enriched themselves through excessive origination fees, management fees, and/or other means.

2.   GUY ANDREW WILLIAMS ("G. WILLIAMS" or "GW"), was a resident of Mesa, Arizona.  Starting at a time before the formation of Mathon Fund I, through on or about April 2005, he, along with others, operating through the Mathon-related Entities,  induced victims to "invest" funds, primarily in Mathon Fund I and/or Mathon Fund, with false promises that the defendants and others could earn high-yield rates of return by making short-term, high-interest hard money loans to borrowers, and through this fraudulent process he and others greatly enriched themselves through excessive origination fees, management fees, and/or other means.

3.   BRENT F. WILLIAMS ("B. WILLIAMS" or "BW"), was a resident of Mesa, Arizona, and served, at various times, as the Chief Financial Officer and Chief Operating Officer of the Mathon-related Entities from on or about August 2003, until on or about April 2005.  With SLADE and G. WILLIAMS, B. WILLIAMS helped oversee the financial and "investment" aspects of the Mathon-related Entities.

---

[1/] The Mathon-related entities included, among others, Mathon Management Company, L.L.C., Slade Williams and Associates, L.L.C., Mathon Fund I, L.L.C., Mathon Fund, L.L.C., Round Valley Capital, L.L.C., W.S.F. World Sports Fan, L.L.C., MM Colonial Fund, L.L.C., Mill Creek, L.L.C., Cedar Crest, L.L.C., and Aspen Grove L.L.C. (collectively referred to as "Mathon-related Entities").  The defendants created and managed approximately 53 oftentimes overlapping Mathon-related Entities.  They also opened, controlled, and used approximately 60 bank accounts in the names of these different Mathon-related Entities, and directed and controlled the allocation of the funds within those bank accounts.

4.     DOUGLAS EDWARD TOWLER ("TOWLER" or "DT"), was a resident of Scottsdale, Arizona. Between on or about June 2002 to on or about February 8, 2005, TOWLER played a key role in locating particular short-term borrowers, and thereafter purportedly conducting the necessary due diligence to determine whether each borrower had the assets and revenue stream to repay the loans when due. TOWLER often was introduced to victim investors for the purpose of giving victim investors a false sense and assurance that the short-term, high interest hard money loans were secure and likely to be repaid. According to records provided to investors, TOWLER purportedly served as Executive Vice President of Mathon Fund and was in charge of corporate consulting and advisory services.

5.     RUSSELL LAURENCE SEWELL ("SEWELL" or "RS"), was a resident of Mesa, Arizona. Between on or about October 2003 through on or about July 2004, SEWELL served as Chief Compliance Officer within the Mathon-related Entities and was the managing partner and often sole member of the Aspen Grove entities. SEWELL helped create the Mathon Fund, managed its sales representatives, and reviewed subscription agreements with victim investors.

## RELEVANT ENTITIES

6.     Slade Williams and Associates, L.L.C. ("SWA"), was an Arizona limited liability company, formed on or about May 17, 1999. The only members of SWA were defendants SLADE and G. WILLIAMS.

7.     Mathon Management Company, L.L.C. ("MMC"), was originally formed as an Arizona limited liability company on or about February 5, 2002. On or about November 14, 2003, MMC was then formed into a Delaware limited liability company. The sole member of MMC was SWA.

8.     Mathon Fund I, L.L.C. ("MATHON FUND I"), was an Arizona limited liability company, formed on or about February 5, 2002. MMC was the sole member of MATHON FUND I. MATHON FUND I and MATHON FUND (see below) were the primary entities through which funds "invested" by victims were loaned to third-party borrowers. MATHON FUND I was one of the primary entities through which *Ponzi* payments were made to "investors." It was falsely

1   represented to victims that the funds invested in MATHON FUND I would be loaned to specific

2   borrowers.

3   9.      Mathon Fund, L.L.C. ("MATHON FUND"), was originally an Arizona limited liability

4   company, formed on or about August 20, 2003. On or about September 17, 2003, MATHON

5   FUND was then formed into a Delaware limited liability company. MMC was the sole member

6   of MATHON FUND and was the manager of MATHON FUND.    As aforementioned,

7   MATHON FUND and MATHON FUND I were the primary entities used by the defendants.

8   Unlike MATHON FUND I, the funds "invested" in the MATHON FUND were pooled

9   purportedly for the purpose of making high-interest, short-term hard money loans to borrowers.

10  MATHON FUND was one of the primary entities through which *Ponzi* payments were made to

11  "investors."

12  10.     Round Valley Capital, L.L.C. ("ROUND VALLEY"), was an Arizona limited liability

13  company, formed on or about May 25, 2001. The only members of ROUND VALLEY were

14  defendants SLADE and G. WILLIAMS. Some "investor" funds were transferred to or deposited

15  with ROUND VALLEY.

16  11.     W.S.F. - World Sports Fans, L.L.C. ("WSF"), was an Arizona limited liability company,

17  formed on or about July 19, 1999. The only members of WSF were defendants SLADE and G.

18  WILLIAMS. Some "investor" funds were transferred to or deposited with WSF.

19  12.     MM Colonial Fund, L.L.C. ("MM COLONIAL"), was a Delaware limited liability

20  company, formed on or about October 29, 2003. The original name of MM COLONIAL was

21  Mathon Fund II, L.L.C. MMC was the manager of the MM COLONIAL, and SWA was a

22  member.

23  13.     Mill Creek, L.L.C. ("MILL CREEK"), was an Arizona limited liability company, formed

24  on or about May 25, 2001. SWA was the sole member of MILL CREEK.

25  14.     Defendant SEWELL formed several Aspen Grove entities (collectively referred to as

26  "ASPEN GROVE"). Aspen Grove Capital, L.L.C. was originally formed as a Utah limited

27  liability corporation on or about December 9, 1999. On or about October 24, 2005, the entity

28                                                    4

was registered in Arizona and listed its principal place of business in Mesa, Arizona. Defendant SEWELL was its sole member. Aspen Grove Capital Group, L.L.C. was a Delaware limited liability company, formed on or about May 5, 2000. The entity had its principal place of business in Mesa, Arizona, and defendant SEWELL was its sole member. Aspen Grove Capital Partners I, LP, was a Delaware limited liability partnership, formed on or about May 5, 2000. Defendant SEWELL was its managing partner. Aspen Grove Capital Management, L.L.C. was a Delaware limited liability company, formed on or about September 14, 2001. Defendant SEWELL was its managing partner.

## COUNT ONE
### Conspiracy
### [18 U.S.C. § 1349]

15. The factual allegations in paragraphs 1 through 14 of this Indictment are incorporated by reference and re-alleged as though fully set forth herein.

16. Beginning no later than on or about February 2002, through on or about April 2005, in the District of Arizona and elsewhere, defendants SLADE, G. WILLIAMS, B. WILLIAMS, TOWLER, and SEWELL, individually and doing business under the entities described above, along with other individuals and entities known and unknown to the Grand Jury, did knowingly and willfully agree and conspire with each other to commit the following offenses against the United States:

    a.    Title 18, United States Code, Section 1341 (Mail Fraud); and

    b.    Title 18, United States Code, Section 1343 (Wire Fraud).

## OBJECTS OF THE CONSPIRACY AND SCHEMES TO DEFRAUD

17. The objects of the conspiracy and schemes to defraud, as devised and executed by the defendants and others, through the various entities described above, were:

    a.    to induce victims to "invest" funds, generally in MATHON FUND I and/or MATHON FUND, with false promises that the victims could earn high-yield rates of return by making short-term, high-interest hard money loans to borrowers,

1   when the defendants and others knew that existing loans were in default or non-

2   performing and/or otherwise incapable of generating sufficient income to meet the

3   loan obligations;

4   b.   to conceal from victim investors that the loans to borrowers were in default, non-

5   performing and/or otherwise incapable of generating high rates of returns on the

6   "investments" as represented;

7   c.   to repay most of the earlier victim investors with funds from later victim investors

8   defrauded in the same manner (i.e., through a *Ponzi* scheme); and

9   d.   to avail themselves of large sums of "investor" funds in the form of exorbitant

10   management and origination fees, salaries, bonuses, or by whatever means, to the

11   detriment of victim investors.

12   **MANNER AND MEANS OF THE CONSPIRACY AND SCHEMES TO DEFRAUD**

13   18.   The manner and means used by the defendants, and others, through the entities described

14   above, to achieve the objects of the conspiracy and the schemes and artifices to defraud, included

15   the following:

16   a.   The defendants established and controlled a network of sales representatives and

17   management employees for the Mathon-related Entities. This network was used

18   to assist in the false and fraudulent schemes to raise money from victim investors

19   in at least four different but overlapping "investment" programs. Three of the

20   programs purportedly involved short-term hard money loans. [2/] The remaining

21   program offered a so-called equity interest in the management fees generated by

22   these "investment" schemes. [3/]

23   b.   Prior to the inception of MATHON FUND I, defendant SLADE offered and sold

24   participation points in defendant SEWELL's Aspen Grove Management

25

26   [2/]   Mathon Fund I, Mathon Fund and MM Colonial Fund.

27   [3/]   MMC Participation Points.

28

1   Company. Some of the funds eventually raised from the victim investors in

2   MATHON FUND I were fraudulently used to repay the "investors" in the Aspen

3   Grove participation point program, which was a precursor to the fraudulent

4   participation points program used by the defendants in MMC. Because the Aspen

5   Grove debtor-investors were led to believe that their Aspen Grove "investment"

6   had earned a legitimate return on investment, and having no awareness that the

7   funds actually came from victim investors in MATHON FUND I, many of the

8   Aspen Grove participants were fraudulently induced to continue "investing" funds

9   in programs sponsored by the defendants in the Mathon-related Entities.

10   c.   The defendants began fraudulently deceiving victim investors through MATHON

11        FUND I, which was created on or about February 2002. From on or about

12        November 2002, through February 2004, the defendants fraudulently induced over

13        175 victims to "invest" more than $102 million into MATHON FUND I. To get

14        victims to invest these sums, the defendants, and others, fraudulently

15        misrepresented the following:

16        (1)   That the "investments" could earn extraordinary above-market rates

17              of return (e.g., 75% or more annualized) by making short-term, high

18              interest hard money loans to borrowers;

19        (2)   That the defendants had substantial experience making loans of this

20              nature, with few, if any, historical defaults on such risky loans;

21        (3)   That other victim investors had already profited greatly from

22              "investing" in the program; [4]

23        (4)   That the loans were performing and not troubled or in a state of

24              default;

25   _____

26   [4] MATHON FUND I and MATHON FUND were marketed almost exclusively to
     members of The Church of Jesus Christ of Latter-day Saints, to which defendants belonged.
27   Word of mouth and cross-selling among Church members were used heavily by the defendants
     in their schemes to defraud.

28                                    7

(5)   That each loan was secured and collateralized by specific assets with a fair market value at least two to three times the amount of the loan;

(6)   That many of the loans were further secured by personal guarantees from the borrowers; and

(7)   That "returns" came from the repayment of these high risk loans, when, in effect, victims were generally paid with funds from new "investors."

d.   The defendants had victims sign an "Investment Agreement," a "Letter of Understanding and Agency Agreement," a "Guaranty Agreement," a "Non-Recourse and Unsecured Promissory Note," and a "Credit and Security Agreement," which reflected that their funds would be loaned to MATHON FUND I, rather than the third-party borrowers. Thereafter, MATHON FUND I would loan some of the "investment" funds to these third party borrowers, and would secure the MATHON FUND I third-party loans with some collateral from the borrowers. By structuring each transaction in this fashion, a victim investor's "investment" was completely unsecured and without recourse against the actual borrower's collateral.

e.   The defendants also structured each transaction in a way that hid each side of the transaction from the other (i.e., actual borrower and actual lender). The defendants did not disclose the identity of the true borrower to the "investor" or the "investor" to the actual borrower. This double-blind loan structure helped the defendants conceal from victim investors the troubled or default nature of these loans, and allowed defendants to conduct the ruse of continuing to pay earlier victim investors through the deposits of later investors rather than from any actual interest earned from any hard money loans (e.g., in a *Ponzi* fashion).

8

f.   The defendants and others, through MATHON FUND I, oftentimes structured the sales pitch and marketing materials to make victim investors believe that their "investments" were earmarked for particular investment "pipes" or "tranches" pertaining to unidentified but distinct borrowers. This sales method often deceived a victim investor into thinking that he or she was the only "investor" for that borrower, and that the promised collateral and guarantees were not being shared or diluted among a pool of other victim investors for the same loan.

g.   The defendants and others, through MATHON FUND I, sometimes would oversell a particular "investment" loan arrangement to victim investors, on occasion after the borrower had obtained his loan and the so-called "investment" opportunity had closed. An example of this was the Texen Oil transaction. The defendants raised approximately $10 million from victim investors in 2003 for this particular loan, but distributed only about $3.2 million to the borrower. Instead, approximately fifty percent (50%) of the "investment" funds, around $4.9 million, was siphoned off to MMC and ROUND VALLEY. In this same manner, the defendants created other sales stratagems to fraudulently induce victim investors to "invest" their funds in either MATHON FUND I or MATHON FUND. An example is the purported sale or transfer of victim MB's "investment" interest in MATHON FUND I. Starting on or about December 2003, after failing to get victim MB to "roll" his $4.1 million "investment" into the MATHON FUND, and because victim MB was requesting full repayment through the personal guarantee given to him from defendant SLADE, the defendants devised the idea of selling MB's interest at a discount to other victim investors. The defendants and others told potential victim investors that victim MB needed to sell his MATHON FUND "investment" at a discount because he was going through a "nasty" divorce and needed to purportedly liquidate his "investment" for the divorce proceedings. At the time, all of the purported loans associated with victim MB's "investment"

9

were non-performing or in default. With this story, the defendants fraudulently induced several victim investors to transfer approximately $14.8 million to the defendants for victim MB's so-called $4.1 million position in the MATHON FUND I "investments."

h.   The defendants structured the "investments" to skim off excessive fees. MATHON FUND I oftentimes charged investors an annual $25,000 management fee. The defendants also charged origination fees and commissions to the actual third-party hard money borrowers. At times, the upfront fees charged to borrowers were 20% of the amount of the loans, or higher. The burden of these excessive fees, when combined with the extremely high interest rates being charged on these short term loans, made it almost an economic and accounting certainty that most of the loans would be non-performing and go into default. By skimming off so much of the "investor" funds on the front end, the defendants knew from the beginning that the actual loans were unlikely to be viable as a means of paying the individual victim investors their promised returns. Therefore, almost from the beginning, the defendants had to structure their schemes in a way that would generate the funds necessary to perpetuate an inevitable *Ponzi* scenario.

i.   The defendants, from the inception of MATHON FUND I, began fraudulently diverting "investor" funds to projects and activities wholly unrelated to the promises and representations made to victim investors. For example, on or about November 2002, the defendants fraudulently raised approximately $6.2 million from victim investors. Instead of using the monies to fund "hard money" loans as promised, the defendants took this $6.2 million and purportedly "loaned" these funds to MILL CREEK ( an entity wholly owned by defendants WILLIAMS and SLADE through SWA). This "loan" to MILL CREEK was structured to make it appear that victim investor funds were purportedly being "invested" in a typical loan arrangement, when, in fact, MILL CREEK was nothing more than a shell

10

entity used by the defendants to buy the ASPEN GROVE "equity" or "participation" points from an earlier group of "investors" in ASPEN GROVE. Because the defendants made the "loan" to MILL CREEK on a short-term basis, the defendants thereafter raised, from on or about December 2002, through on or about June 2003, approximately $7.8 million from a second wave of new MATHON FUND I victims to pay these prior MATHON FUND I victims whose money was purportedly loaned to MILL CREEK. This *Ponzi* process continued and the defendants subsequently raised, from on or about April 2003, through on or about November 2003, a third wave of approximately $9.4 million from purportedly selling "equity" or "participation" points in MMC, and these funds were thereafter used to fraudulently repay the second wave of MATHON FUND I victim investors as noted above. Eventually, because the MILL CREEK "loan" had no collateral or guarantees, and was a fiction except on paper, approximately $2.4 million of principal and interest on the MATHON FUND I books was written off as a purportedly uncollectible debt.

j.    In many instances, a short-term, high interest loan was funded for a long-term, non-revenue generating project. These mismatches made the loans and "investment" scenarios non-viable from the beginning. An example was the TMC Partners $14.1 million loan for the commercial and residential development of 326 acres of raw land in Waterford, Connecticut. A short term loan of this nature, for a project of this sort, could not conceivably meet the promised returns to victim investors in the timeframe established under the usurious and onerous terms of the loan. The fact that the defendants also failed to adequately assess several zoning issues, the need for several structural enhancements to the land, and the potential demise of the main employer in the region, further exacerbated the non-viable nature of this loan and the underlying project. The Parsons 4E loan was another example. More than $5 million was loaned on a short -term basis to

11

a coal mine operator in Kentucky in order for the borrower to maintain certain coal leases.

k. The defendants fraudulently extended loans, or advanced additional funds, to losing ventures. This was done by the defendants to make loans in default or arrears appear to be viable, in order to attract more investors and/or generate still more exorbitant fees, most of which were fraudulently transferred to entities controlled and owned by the defendants. The Parsons 4E lending scenario illustrates this part of the scheme. On or about October 2, 2003, the borrower signed a promissory note for $5,350,000, which was due on February 11, 2004. Only $3,384,000 of the funds from MATHON FUND I "investors" was loaned to the borrower. Mathon-related Entities received $816,000 in commissions and origination fees. Of the $816,000, defendants SLADE and WILLIAMS received $179,430, defendant B. WILLIAMS received $16,534, defendant TOWLER received $93,947, and defendant SEWELL received $24,775. No payments were made on the original note, which went into default on February 11, 2004. On or about March 16, 2004, a two-month extension agreement on the original defaulted note was signed with a new due date of May 15, 2004, and a new principal and interest balance of $5,937,140. On or about March 16, 2004, the Parson 4E borrower signed a second promissory note with WSF for $400,000, with a maturity date of May 15, 2004. The rate of interest on this note was fifty percent (50%) *per month*. No funds on this $400,000 Note were ever distributed to the borrower. Instead, knowing this loan was non-performing, defendants enriched themselves by extending it. On April 5, 2004, the defendants caused MATHON, using victim investor funds from MATHON FUND I, to purchase the $400,000 note from WSF for $800,000. That same day, WSF then transferred the following sums to the defendants: TOWLER ($114,280); WILLIAMS ($100,000); SLADE ($100,000); B. WILLIAMS ($57,140) and SEWELL ($28,580). Both the Original

12

1    Note and the Second Note were extended again.  On or about February 11, 2005,

2    the promissory Notes were rewritten into a "Settlement Agreement and Mutual

3    Release" note in the amount of $7 million, and at a lower interest rate.  The

4    Parsons 4E borrower never made one payment on any of these Notes and/or

5    extensions.

6  l.    By late 2003, the MATHON FUND I's loan portfolio was either non-performing,

7        projected to be non-performing, or in default.  To extend the life of the *Ponzi*

8        scheme, the defendants devised the idea of creating a new "equity" MATHON

9        FUND.  The defendants created MATHON FUND to convert the old MATHON

10       FUND I "lender investors" into so-called "equity investors."  In this fashion, on

11       the eve of many loans going into default, the old MATHON FUND I "investors"

12       would supposedly "rollover" their original "investment," plus earned interest, into

13       the new MATHON FUND.  No funds were ever transferred from MATHON

14       FUND I to MATHON FUND. Only the obligations owed to the MATHON FUND

15       I "investors" were rolled over, thus creating the illusion that their original

16       "investment" had paid in full.  Any new MATHON FUND "investors" were not

17       told that the MATHON FUND was insolvent from its inception.

18 m.    The defendants began operating the MATHON FUND pursuant to a Private

19       Placement Memorandum ("PPM") dated November 25, 2003.  The PPM did not

20       disclose MMC's intent to convert or "roll over" many of the MATHON FUND

21       I victim investors into the new MATHON FUND, nor did the PPM disclose

22       MMC's plan to transfer troubled or defaulted loans from MATHON FUND I into

23       the new MATHON FUND loan portfolio.  The PPM further touted MMC's prior

24       experience with MATHON FUND I, but failed to disclose how many MATHON

25       FUND I loans were non-performing, under-collateralized, and in or near default.

26       The PPM also falsely claimed that the new MATHON FUND would be less risky

27       for the following reasons:

28                                           13

(1) That pooling funds and loans would spread the risk of default across a broader investment base;

(2) That "fund insurance" would be purchased to insure the loan portfolio from unusual default rates; and

(3) That a "Reserve Account" would be created and funded to act as a safety net in troubled times.

None of these measures was implemented in a way that created any real benefits to "investors" in MATHON FUND. Instead, the defendants actually augmented the risks to "investors" by consolidating most of the troubled loans from MATHON FUND I into the portfolio of loans for MATHON FUND; they never purchased "fund insurance" of any sort; and they funded the so-called "Reserve Account" with non-performing or troubled assets.

n. The PPM prohibited "investors" from withdrawing funds unless or until the funds had been "invested" with MATHON FUND for at least 180 days, thus delaying the discovery of the *Ponzi* scheme.

o. The defendants, in a manner even more aggressive than their conduct in MATHON FUND I, charged "investors" an exorbitant monthly management fee of 2.0833%, or 25% annually, of the total balance of all MATHON FUND capital accounts. The defendants used this fee structure to syphon off additional millions from victim investors. In light of this new exorbitant fee structure, in combination with the impractical loan origination fees and usurious rates of interest charged on hard money loans, the defendants knew that the MATHON FUND, like its predecessor MATHON FUND I, was, in fact, a non-viable endeavor and nothing more than the latest evolution in their *Ponzi* scheme.

p. As part of the *Ponzi* scheme, the defendants sent victim "investors" in the MATHON FUND purported monthly account statements of their capital accounts. These "account statements" were often sent out late, and supposedly reflected

what a victim's account was worth under a "cash" and "accrual" basis of accounting. Many of the entries were contrived and clearly not supported by the underlying economic circumstances or accounting records. Both methods failed to accurately account for the non-performing or default nature of the loan portfolio, or the fact that each victim's "capital investment" was already greatly diminished in value and insufficiently collateralized. Instead, the defendants falsely represented that these "capital" accounts had maintained their value, and that the loans underlying these accounts were performing and otherwise accruing realizable investment interest.

q.    From November 2003, until April 5, 2005, when the Arizona Corporation Commission obtained a restraining order in the Conservatorship Action against defendants SLADE, G. WILLIAMS and the entities they owned and controlled, the defendants fraudulently induced over 100 victim investors to transfer more than $51 million into MATHON FUND.

r.    To fraudulently raise additional funds from victim investors, the defendants, through MMC, also sold so-called "participation points" in MMC's exorbitant monthly management fee. A participation point "investor" was supposedly entitled to receive a proportionate share of MMC's monthly management fee for managing the MATHON FUND. A participation point victim was purportedly entitled to receive one percent (1%) of MMC's annual twenty-five percent (25%) management fee, which was assessed against the inaccurately reported outstanding principal balances in the MATHON FUND capital accounts. One equity point was stated to cost $1 million, though it was sometimes sold to victim investors at a price different than its purported face value. In some instances, MATHON FUND "investors" rolled over their "investment" into the participation point investment scheme.

15

s.  From December 2003, until April 5, 2005, the defendants fraudulently induced at least nine victim investors to "invest" more than $9 million in this "participation points" *Ponzi* program.

t.  In the months just prior to the Arizona Corporation Commission ("ACC") Conservatorship action on April 5, 2005, the defendants were in the formative stage of creating the next stage in the *Ponzi* scheme – MM COLONIAL, a Delaware limited liability company formed on or about October 29, 2003.  It was originally named Mathon Fund II, but on or about February 9, 2005, the name was changed in the State of Delaware to MM COLONIAL.  The Articles of Amendment to change the name to MM COLONIAL was filed with the ACC on or about February 15, 2005.  MM COLONIAL was formed as a successor to MATHON FUND to raise additional funds from new victim "investors."  In the brief time MM COLONIAL was up and running, approximately $300,000 was raised from victim investor SK.  Shortly after the "investment" was made by SK, defendant B. WILLIAMS had $250,000 of SK's funds transferred as a *Ponzi* payment to victim investor KH on his previous "investment" in MATHON FUND.

u.  The defendants, through the various entities and "investment" mechanisms outlined above, used funds obtained from later "investors" to improperly repay claims from or obligations owed to earlier "investors."  Through various fraudulent maneuvers and voluminous misrepresentations, the defendants fraudulently induced earlier "investors" to believe they were earning actual returns from the repayment of hard money loans, or that they should "re-invest" their alleged paper earnings in the next stage of this *Ponzi* scheme.  As to later "investors," the defendants did not disclose that their funds would be used to repay old debts or satisfy earlier *Ponzi* victims of the scheme.

16

1    v.    During the period of this *Ponzi* scheme, the defendants took the following

2          approximate sums from victim investors as purported compensation and other

3          financial remuneration for their fraudulent activities:

4                (1)    Duane Slade               $5,442,840

5                (2)    Guy Williams             $5,862,064

6                (3)    Brent Williams           $623,888

7                (4)    Douglas Towler           $2,440,092

8                (5)    Russell Sewell           $239,255 [5/]

9    w.    From on or about February 2002, through on or about April 2005, during this

10         *Ponzi* scheme, the defendants defrauded at least 240 victim investors out of more

11         than $160 million.  When the *Ponzi* scheme was discovered, approximately 147

12         victims had unrecovered losses totaling more than $75 million.

## OVERT ACTS

14   19.  In furtherance of the aforesaid conspiracy, and to achieve the objects of the conspiracy, the

15   defendants, and others known and unknown, through the entities described above, committed

16   or caused to be committed, various acts in the District of Arizona and elsewhere.

17   a.    The following overt acts, among others, were committed:

18         (1)    On or about February 5, 2002, Articles of Organization were filed with the

19                Arizona Corporation Commission to form MATHON FUND I.

20         (2)    On or about January 3, 2003, defendant SLADE caused victim investor WP

21                to transfer $100,000 to MATHON FUND I.

22         (3)    On or about January 6, 2003, defendant SLADE caused victim investor SJ

23                to transfer $125,000 to MATHON FUND I.

24         (4)    On or about March 11, 2003, defendant SLADE caused victim investor DD

25                to wire $120,000 to the Bank of America account for MATHON FUND I.

---

27   [5/] Defendant SEWELL was "employed" only nine months. This figure does not take into consideration any monies/benefits he might have received through ASPEN GROVE entities.

17

(5)   On or about March 11, 2003, MATHON FUND I issued a check to victim investor CP in the amount of $62,500. Defendant SLADE falsely represented the funds were a return on CP's original "investment" when, in fact, the funds came from a new victim investor.

(6)   On or about March 11, 2003, MATHON FUND I issued a check to victim investor GD in the amount of $62,500. Defendant SLADE falsely represented the funds were a return on GD's original "investment" when, in fact, the funds came from a new victim investor.

(7)   On or about April 7, 2003, defendant SLADE caused victim investor MB to wire $1,000,000 to the Bank of America account for MATHON FUND I.

(8)   On or about June 2, 2003, victim investor SJ received an Investor Receipt of Investment Funds statement from MATHON FUND I, acknowledging that he received $175,000 for his $125,000 "investment" made on January 6, 2003.

(9)   On or about July 3, 2003, defendant SLADE and others caused victim investor DR to transfer $200,000 to MATHON FUND I.

(10)   On or about August 20, 2003, Articles of Organization were filed with the Arizona Corporation Commission to form MATHON FUND, L.L.C.

(11)   On or about September 24, 2003, defendant SLADE caused victim investor MJB, Ltd. to transfer $1,500,000 to the MATHON FUND I.

(12)   On or about October 2, 2003, MATHON FUND I loaned Parsons 4E $5,350,000 due on February 10, 2004.

(13)   On or about October 2, 2003, defendant SEWELL received a payment of $24,775 from an MMC account for the purported commission on the Parsons 4E promissory note.

(14) On or about October 2, 2003, defendant TOWLER received a payment of $24,775 from an MMC account for the purported commission on the Parsons 4E promissory note.

(15) On or about October 2, 2003, defendant TOWLER received a payment of $52,638 from a ROUND VALLEY account for the purported commission on the Parsons 4E promissory note.

(16) On or about October 29, 2003, Articles of Organization were filed with the Arizona Corporation Commission to form MM COLONIAL FUND, L.L.C.

(17) On or about November 10, 2003, victim investor DR received $253,000 as a purported return on his original "investment" in MATHON FUND I dated on or about July 3, 2003.

(18) On or about December 15, 2003, defendant SLADE caused victim investor BCC to transfer $2,000,000 to MATHON FUND I.

(19) On or about December 17, 2003, defendant SLADE caused victim investor SJ to purportedly rollover his September 5, 2003 investment of $490,000 into the purported purchase of a MM Participation Point.

(20) On or about December 31, 2003, defendants SLADE, G. WILLIAMS and B. WILLIAMS wrote off $2,472,000 of principal and interest on the MILL CREEK loan.

(21) On about January 31, 2004, defendant G. WILLIAMS transferred MATHON FUND I's entire interest in the TMC Partners loan to MATHON FUND.

(22) On or about March 9, 2004, an email was sent to SLADE and G. WILLIAMS regarding maturing loans. The email discussed repaying past loans from new victim investor funds coming into the MATHON FUND. Defendants SLADE and G. WILLIAMS were advised that they risked

19

being accused of "robbing Peter to pay Paul" and they should take precautions.

(23) On or about March 12, 2004, defendant TOWLER loaned WSF $100,000 purportedly for the Parsons 4E loan. Despite the loan being in default, defendant TOWLER received back his original investment plus interest.

(24) On or about March 12, 2004, defendant SEWELL provided a check in the amount of $25,000 for the Parsons 4E loan extension.

(25) On or about March 16, 2004, with the Parson 4E loan in default at this time, defendant G. WILLIAMS signed an extension agreement extending the due date for the repayment of the loan.

(26) On or about March 18, 2004, defendant TOWLER received $50,000 from ROUND VALLEY as a part of the Parsons 4E loan extension.

(27) On or about March 18, 2004, defendant TOWLER received $42,860 from WSF as part of the Parsons 4E loan extension.

(28) On or about March 18, 2004, defendant B. WILLIAMS received $21,430 from WSF as part of the Parsons 4E loan extension.

(29) On or about March 18, 2004, defendant SEWELL received $10,710 from WSF as part of the Parsons 4E loan extension.

(30) On or about March 25, 2004, defendants SLADE and G. WILLIAMS caused victim investor KH to transfer $500,000 to MATHON FUND.

(31) On or about March 29, 2004, defendants SLADE, G. WILLIAMS, B. WILLIAMS, TOWLER and SEWELL held a management meeting for the Mathon-related Entities, in which they discussed issues regarding the problems with cash flow, specifically upcoming payroll, point payments, defaulted loans, and replenishment of the reserve fund.

(32) On or about March 29, 2004, victim investor KH received a check for $990,526.03 personally from defendant G. WILLIAMS. Defendant G.

20

WILLIAMS represented that the funds were from defendants SLADE and G. WILLIAMS' personal funds, because the loan associated with the original "investment" had not yet paid off.

(33)   On or about April 1, 2004, the defendants caused victim investor AA to transfer $1,500,000 to MATHON FUND.

(34)   On or about April 2, 2004, defendants SLADE and G. WILLIAMS caused victim investor KH to transfer $900,000 to MATHON FUND.

(35)   On or about April 5, 2004, MATHON FUND purchased this second Parsons 4E promissory note with WSF for $800,000.

(36)   On or about April 5, 2004, defendant TOWLER received $114,280 from WSF as part of the Parsons 4E second promissory note arrangement.

(37)   On or about April 5, 2004, defendant B. WILLIAMS received $57,140 from WSF as part of the Parsons 4E second promissory note arrangement.

(38)   On or about April 5, 2004, defendant SEWELL received $28,580 from WSF as part of the Parsons 4E second promissory note arrangement.

(39)   On or about April 6, 2004, defendants SLADE and G. WILLIAMS caused victim investor KH to transfer $350,000 to MATHON FUND.

(40)   On or about April 12, 2004, defendants SLADE, G. WILLIAMS, B. WILLIAMS, TOWLER and SEWELL held a management meeting for the Mathon-related Entities to discuss problem and defaulted loans.

(41)   On or about April 27, 2004, the defendants caused victim investor LWP to "rollover" a purported "investment" of $720,813 from MATHON FUND I to MATHON FUND.

(42)   On or about May 5, 2004, defendant G. WILLIAMS, on behalf of MATHON FUND I, executed but did not record a partial assignment of beneficial interest for the TMC Partners property.

(43) On or about May 7, 2004, the defendants transferred $2,499,980 to victim BCC from the MATHON FUND Compass Bank account.

(44) On or about June 22, 2004, defendant SEWELL caused victim investor SJ LT to purportedly roll his original October 27 and 29, 2003 "investment" of $500,000 into the MATHON FUND.

(45) On or about July 1, 2004, the defendants caused victim investor KH, Inc., to transfer $2,600,000 to MATHON FUND.

(46) On or about July 6, 2004, defendants SLADE, G. WILLIAMS and B. WILLIAMS drafted a Private Placement Memorandum for prospective investors, which contained false and misleading information.

(47) On or about July 30, 2004, the defendants caused victim investor JW to transfer $1,500,000 to MATHON FUND.

(48) On or about August 31, 2004, defendants SLADE, G. WILLIAMS, and others, caused victim investor AG to transfer $1,000,000 to MMC, and the victim investor was falsely told that he would be buying out a previous victim investor who needed his money back because of a divorce.

(49) On or about September 8, 2004, defendant SLADE and G. WILLIAMS transferred victim investor funds of $1,750,000 from MMC to Wealth Partners.

(50) On or about September 13, 2004, defendant G. WILLIAMS signed a promissory note with victim investor RL for a $1 million purported "investment" with Mathon Management Company.

(51) On or about December 10, 2004, the defendants caused victim investors P and JZ to transfer $200,000 to MATHON FUND.

(52) On or about December 10, 2004, the defendants caused victim investor GZ to transfer $100,000 to MATHON FUND.

(53) On or about December 16, 2004, the defendants caused victim investors P and JZ to transfer $100,000 to MATHON FUND.

(54) On or about December 17, 2004, the defendants caused victim investor DG Development to transfer $500,000 to MATHON FUND.

(55) On or about December 21, 2004, the defendants caused victim investor DS, through entity SLF, L.L.C., to transfer $1,500,000 to MATHON FUND.

(56) On or about December 22, 2004, the defendants caused victim investor EP, L.L.C., to transfer $100,000 to MATHON FUND.

(57) On or about December 22, 2004, the defendants caused victim investor SB, through entity FTF, to transfer $75,000 to MATHON FUND.

(58) On or about December 23, 2004, the defendants caused victim investor BB, through entity BV, to transfer $300,000 to MATHON FUND.

(59) On or about December 23, 2004, the defendants caused victim investor BB, through entity BV, to transfer $200,000 to MATHON FUND.

(60) On or about December 30, 2004, the defendants caused victim investor PF to transfer $34,000 to MATHON FUND.

(61) On or about January 7, 2005, the defendants caused victim investors J and EB to transfer $100,000 to MATHON FUND.

(62) On or about January 7, 2005, the defendants caused victim investors P and JZ to transfer $400,000 to MATHON FUND.

(63) On or about January 27, 2005, the defendants caused victim investor AW, L.L.C., to transfer $2,700,000 to MATHON FUND.

(64) On or about January 28, 2005, the defendants caused MATHON FUND to transfer $50,000 victim investor BW, through entity TL.

(65) On or about February 8, 2005, the defendants caused victim investor BV to transfer $250,000 to MATHON FUND.

(66) On or about February 11, 2005, defendants SLADE, G. WILLIAMS and B. WILLIAMS drafted a Private Placement Memorandum for MM COLONIAL, which contained false and misleading information and was provided to prospective investors.

(67) On or about February 11, 2005, with the loan in default at this time, defendant SLADE, G. WILLIAMS, and B. WILLIAMS signed another extension agreement extending the due date for the repayment of the Parsons 4E loan.

(68) On or about February 11, 2005, with the loan in default at this time, defendants SLADE, G. WILLIAMS and B. WILLIAMS released the collateral securing the Parsons 4E loan.

(69) On or about February 17, 2005, the defendants caused victim investor HCBG, L.L.C., to transfer $200,000 to MATHON FUND.

(70) On or about March 11, 2005, the defendants caused victim investors P & JZ FT, to transfer $250,000 to MATHON FUND.

(71) On or about March 25, 2005, the defendants caused victim investor BF to transfer $500,000 to MATHON FUND.

(72) On or about March 29, 2005, the defendants caused victim investor Dr. K to transfer $300,000 to MM COLONIAL.

(73) On or about April 1, 2005, the defendants caused MATHON FUND to transfer $100,000 to victim investor KT, through entity KH.

(74) On or about April 4, 2005, the defendants caused MATHON FUND to transfer $53,511.51 to victim investor RSB.

All in violation of Title 18, United States Code, Sections 1349 and 2.

24

## COUNTS TWO THROUGH FIVE
### Mail Fraud
### [18 U.S.C. § 1341]

20. The factual allegations in paragraphs 1-14 and 17-19 of the Indictment are incorporated by reference and re-alleged as though fully set forth herein.

21. Beginning no later than on or about February 2002, through on or about April 2005, in the District of Arizona and elsewhere, defendants SLADE, G. WILLIAMS, B. WILLIAMS and TOWLER (as to Counts 2 and 3), individually and doing business under the entities described above, along with others known and unknown to the Grand Jury, did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent promises, pretenses, and representations, and the concealment of material facts.

22. On or about the dates listed below, in the District of Arizona and elsewhere, for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, defendants SLADE, G. WILLIAMS, B. WILLIAMS, and TOWLER (as to Counts 2 and 3), individually and doing business under the entities described above, along with others known and unknown to the Grand Jury, placed and caused to be placed in a post office and authorized depository for mail matter, to be sent and delivered by the United States Postal Service, and deposited and caused to be deposited for delivery by a private and commercial interstate carrier, for delivery by commercial interstate carriers, as shown below for each Count, from the District of Arizona, to the locations set forth in the chart below, each such instance being a separate Count of this Indictment:

| Count | (On or About) Date Mailed | Item Mailed | Carrier |
|-------|---------------------------|-------------|---------|
| 2 | 1/10/05 | Statement of Account Balances, MATHON FUND, cash and accrual basis, mailed to D. and J.  H. | U.S. Mail |

| 3 | 1/10/05 | Statement of Account Balance, MATHON FUND, mailed to C. and N. J. | U.S. Mail |
|---|---------|---|---|
| 4 | 2/14/05 | Private Placement Memorandum #10871, subscription Agreement, and Operating Agreement, for MATHON FUND, mailed to D.H. | U.S. Express Mail |
| 5 | 3/16/05 | Statement of Account Balances, December 2004, for MMC, mailed to S.W. | U.S. Mail |

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS SIX THROUGH EIGHTEEN
### Wire Fraud
### [18 U.S.C. § 1343]

23. The factual allegations in paragraphs 1-14 and 17-19 of the Indictment are incorporated by reference and re-alleged as though fully set forth herein.

24. Beginning no later than on or about February 2002, through on or about April 2005, in the District of Arizona and elsewhere, defendants SLADE, G. WILLIAMS, B. WILLIAMS and TOWLER (as to Counts 6-15), individually and doing business under the entities described above, along with others known and unknown to the Grand Jury, did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent promises, pretenses and representations, and concealment of material facts.

25. On or about the dates listed below, in the District of Arizona and elsewhere, for the purpose of executing and attempting to execute said scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations and promises, defendants SLADE, G. WILLIAMS, B. WILLIAMS, and TOWLER (as to Counts 6-15), individually and doing business under the entities described above, along with others known and unknown to the Grand Jury, did knowingly transmit and cause to be transmitted, by means of wire and radio communications in interstate commerce, certain writings, pictures, signals and sounds (i.e., interstate telephone calls and facsimile transmissions), to and from the District of Arizona and

26

elsewhere, to and from the Compass Bank in Arizona (accounts ending in 7518 or 7526), as set forth in the chart below, each such instance being a separate Count of this Indictment:

| Count | (On or About) Wire Date | Approximate Amount Wired | Investor Initials City/State of Residence | Sending Financial Institution / City/State (Receiving Financial Institution / last 4 account numbers) |
|---|---|---|---|---|
| 6 | 12-10-2004 | $200,000 | P and J.Z. Henderson, Nevada | Merrill Lynch Las Vegas, NV (Compass Bank/7526) |
| 7 | 12-10-2004 | $100,000 | GZ Las Vegas, NV | Wells Fargo Las Vegas, NV (Compass Bank/7526) |
| 8 | 12-16-2004 | $100,000 | P and J. Z. Henderson, NV | Merrill Lynch Las Vegas, NV (Compass Bank/7526) |
| 9 | 12-21-2004 | $1,500,000 | D.S. through entity S.L. F. LLC Farmington, UT | Wells Fargo Farmington, UT (Compass Bank/7526) |
| 10 | 12-22-2004 | $75,000 | S.B. through entity F.T.F., LLC Washington, MO | U.S. Bank St. Claire, MO (Compass Bank/7526) |
| 11 | 12-23-2004 | $300,000 | B.B. through entity B.V. Salt Lake City, UT | U.S.Bank Salt Lake City, UT (Compass Bank/7526) |
| 12 | 12-23-2004 | $200,000 | B.B. through entity B.V. Salt Lake City, UT | Morgan Stanley New York, NY (Compass Bank/7526) |
| 13 | 1-7-2005 | $400,000 | P. and J.Z. Henderson, NV | Merrill Lynch New York, NY (Compass Bank/7526) |
| 14 | 1-28-2005 | $50,000 | B.W. through entity T.L. Investments West Lynn, OR | Compass Bank/7518 San Francisco, CA (Wells Fargo/5155) |
| 15 | 1-31-2005 | $570,000 | S. and S.W. Seattle, WA | Compass Bank/7518 Shoreline, WA (Shoreline Bank/1040) |
| 16 | 3-11-2005 | $150,000 | G. and J.Z. Las Vegas, NV | Merrill Lynch New York, NY (Compass Bank/7518) |

| 17 | 3-11-2005 | $250,000 | P. and J.Z. Henderson, NV | Merrill Lynch New York, NY (Compass Bank/7526) |
| 18 | 4-1-2005 | $100,000 | K. T. through entity K.H. Las, Vegas, NV | Compass Bank/7518 New York, NY Bank of America/6986 |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS NINETEEN THROUGH FORTY
### Transactional Money Laundering
### [18 U.S.C. § 1957(a)]

26. The factual allegations in paragraphs 1-25 of the Indictment are incorporated by reference and re-alleged as though fully set forth herein.

27. On or about the dates set forth below, each such instance being a separate count of this Indictment, defendants SLADE, G. WILLIAMS, B. WILLIAMS, and TOWLER (as to Counts 19-36), and others known and unknown to the Grand Jury, within the United States, knowingly engaged in monetary transactions from a financial institution in the District of Arizona, as set forth below, in criminally derived property of a value greater than $10,000, and which was derived from specified unlawful activity, namely violations of 18 U.S.C. §§ 1341 (Mail Fraud), and 1343 (Wire Fraud), as alleged in Counts 2 through 18 of the Indictment, each such instance being a separate Count of this Indictment, as follows:

| Count | Date of Transaction (Financial Inst. / Last 4 Account numbers) [Check No. / Wire Out / Deposit of Check / Transfer] | Amount Payee | Source of Funds Disbursed | Description of Payment |
|---|---|---|---|---|
| 19 | 12-13-2004 (Northern Trust / 8401) [Check # 10634] | $19,299.40 C.P. | Victim Investor Funds | *Ponzi* Payment |
| 20 | 12-13-2004 (Northern Trust / 8401) [Check #10635] | $19,299.40 G.D. | Victim Investor Funds | *Ponzi* Payment |

| Count | Date of Transaction (Financial Inst. / Last 4 Account numbers) [Check No. / Wire Out / Deposit of Check / Transfer] | Amount Payee | Source of Funds Disbursed | Description of Payment |
|---|---|---|---|---|
| 21 | 12-15-2004 (Northern Trust / 8401) [Check #10639]] | $38,598.81 L.P. | Victim Investor Funds | *Ponzi* Payment |
| 22 | 12-16-2004 (Northern Trust / 8401) [Check # 10636] | $38,598.81 S.J. | Victim Investor Funds | *Ponzi* Payment |
| 23 | 12-21-2004 (Compass Bank / 7518) [Wire Out] | $20,000.00 S.W. | Victim Investor Funds | *Ponzi* Payment |
| 24 | 12-22-2004 (Compass Bank / 7518) [Wire Out] | $1,557,063.38 MMC - Northern Trust / 8401 | Victim Investor Funds | Business Operations |
| 25 | 12-22-2004 (Compass Bank / 7518) [Wire Out] | $32,423.30 W.K. | Victim Investor Funds | Payments to Salesmen |
| 26 | 12-23-2004 (Northern Trust / 8401) [Wire Out] | $74,980.00 MD | Victim Investor Funds | Payment to Salesmen |
| 27 | 12-22-2004 (Northern Trust / 8401) [Check #10659] | $15,000 T.F. | Victim Investor funds | Payments to Salesmen |
| 28 | 12-22-2004 (Northern Trust / 8401) [Check #10664] | $40,988.67 L.P. | Victim Investor Funds | *Ponzi* Payment |
| 29 | 12-22-2004 Northern Trust / 8401) [Check #10663] | $10,247.17 Brent Williams | Victim Investor Funds | Participation Point Payment |
| 30 | 12-23-2004 (Northern Trust / 8401) [Wire Out] | $330,147.16 J.G. | Victim Investor Funds | *Ponzi* Payment |

29

| Count | Date of Transaction (Financial Inst. / Last 4 Account numbers) [Check No. / Wire Out / Deposit of Check / Transfer] | Amount Payee | Source of Funds Disbursed | Description of Payment |
|---|---|---|---|---|
| 31 | 12-23-2004 (Northern Trust / 8401) [Check #10661] | $20,494.33 C.P. | Victim Investor Funds | *Ponzi* Payment |
| 32 | 12-23-2004 (Northern Trust / 8401) [Check #10662] | $20,494.33 G.D. | Victim Investor Funds | *Ponzi* Payment |
| 33 | 1-10-2005 (Compass Bank / 7518) [Wire Out] | $250,000.00 S.M. | Victim Investor Funds | *Ponzi* Payment |
| 34 | 1-14-2005 (Compass bank / 7518) [Wire Out] | $50,000.00 S. and S.W. | Victim Investor Funds | *Ponzi* Payment |
| 35 | 2-1-2005 (Northern Trust / 8401) [Check #10680] | $11,172.23 Brent Williams | Victim Investor Funds | Participation Point Payment |
| 36 | 2-1-2005 (Northern Trust / 8401) [Check #10687] | $89,377.86 WSF | Victim Investor funds | Insider Payment |
| 37 | 3-11-2005 Northern Trust / 8401) [Check #10709] | $26,755.75 G.D. | Victim Investor Funds | *Ponzi* Payment |
| 38 | 3-11-2005 (Compass Bank 7518) [Wire Out] | $150,000 MMC | Victim Investor Funds | Insider Payment |
| 39 | 3-14-2005 (Northern Trust / 8401) [Check #10710] | $26,755.75 C.P. | Victim Investor Funds | *Ponzi* Payment |
| 40 | 4-4-2005 (Northern Trust / 8401) [Transfer of Funds | $26,755.75 WSF - Northern Trust / 8233 | Victim Investor Funds | *Ponzi* Payment |

30

In violation of Title 18, United States Code, Sections 1957(a) and 2.

### FORFEITURE ALLEGATIONS

28.   The factual allegations in paragraphs 1 through 27 of the Indictment are incorporated by reference and re-alleged as though set forth fully herein.

29.   Pursuant to 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461, and as a result of committing one or more of the offenses charged in Counts 1-18 of this Indictment, defendants SLADE, G. WILLIAMS, B. WILLIAMS, TOWLER, and SEWELL shall forfeit to the United States, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses, including but not limited to the aggregate sum of $78,738,707 in U.S. currency, in that the aggregate sum is the proceeds of the specified unlawful acts, as defined in 18 U.S.C. § 1956(c)(7)(A) and § 1961(1), to wit: 18 U.S.C. § 1341 (Mail Fraud) and 18 U.S.C. § 1343 (Wire Fraud).

30.   Pursuant to 18 U.S.C. §982(a)(1), and as a result of committing one or more of the money laundering offenses charged in Counts 19-40 of this Indictment, in violation of 18 U.S.C. § 1957, defendants SLADE, G. WILLIAMS, B. WILLIAMS, and TOWLER, shall forfeit to the United States:

      (a)      All right, title, and interest in any and all property involved in each offense in violation of Title 18, United States Code, Section 1956 or 1957, for which the defendants are convicted, and all property traceable to such property, including the following: 1) all money or other property that was the subject of each transaction, transportation, transmission or transfer in violation of Section 1957; 2) all commissions, fees and other property constituting proceeds obtained as a result of those violations; and 3) all property used in any manner or part to commit or to

31

facilitate the commission of those violations including, but not limited to the following:

Real property located at and known as 3940 E. Forge Avenue, Mesa, Arizona 85206-4543, legal description of Lot 65, Bradley Country Estates, according to Book 300 of Maps, Page 09, records of Maricopa County, Arizona, Tax Parcel No: 140-47-366, titled to Brent F. and Patricia Elaine Williams.

(b)     A sum of money equal to the total amount of money involved in each offense for which the defendants are convicted.

31.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), and 28 U.S.C. Section 2461, the defendants shall forfeit substitute property, up to the value of the amount described above, if by any act or omission of the defendants, the property described above, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

/

/

/

/

/

/

/

/

1    All in accordance with Title 18, United States Code, Sections 981 and 982(a)(1); 28 United

2    States Code, Section 2461; 19 U.S.C. Section 1343 and Rule 32.2(a), Federal Rules of Criminal

3    Procedure.

4                                           A TRUE BILL

5

6
                                            _____/S/_____
7                                           FOREPERSON OF THE GRAND JURY
                                            Date: December 2, 2009
8

9    DENNIS K. BURKE
     United States Attorney
10   District of Arizona

11

12   _____/S/_____
13   STEPHEN W. LARAMORE
     PETER SEXTON
14   KEVIN RAPP
     Assistant U.S. Attorneys
15
     WENDY COY
16   Special Assistant U.S. Attorney

17

18

19

20

21

22

23

24

25

26

27

28