**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR-09-1492-1-PHX-ROS (DKD) |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| Duane Hamblin Slade; et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## I. Background

On December 2, 2009, a Phoenix federal grand jury returned a 40-count indictment against Defendant Duane Hamblin Slade ("Defendant") and four others, charging him with Conspiracy (Count 1), Mail Fraud (Counts 2-5), Wire Fraud (Counts 6-18), and Transactional Money Laundering (Counts 19-40). (Doc. 1) Defendant was arrested on December 10, 2009 in Austin, Texas, and released that same day on conditions by a magistrate judge in the Western District of Texas. (Docs. 35, 44)  As instructed, Defendant appeared with retained counsel before Phoenix Magistrate Judge David K. Duncan on January 6, 2010, for his initial appearance and arraignment, entered pleas of not guilty to all charges, and was released on essentially the same conditions imposed in the Western District of Texas.[1] (Doc. 47) Defendant has been under courtesy supervision by U.S. Pretrial Services Officer Stacie Salinas in the Western District of Texas. Over the next two and one-

---

[1] There was a slight modification of his conditions to allow contact with a co-defendant regarding business matters. (Doc. 47)

half years or so, there were no petitions filed seeking the revocation of Defendant's pretrial release, no reported violations of his pretrial release conditions prior to trial, and no failures to appear at a court proceeding in which Defendant's physical appearance was required.[2]

In 2009, Defendant moved from Mesa, Arizona to Austin, Texas. The 2009 Pretrial Services ("PTS") Report indicates Defendant, age 41, is a U.S. citizen and has family, including his father, residing in Arizona. (Doc. 32)  According to Defendant, at the time of his 2009 arrest in this case, he was employed by his father, Corwin Slade, as Operations Manager for Red Mountain Oil & Gas Co., in Mesa. (*Id*.)  Defendant has been married to Jennifer Slade since 1993, is the father of six children, has no history of alcohol or illicit drug use, and has no prior convictions or arrests of any kind. (*Id*.)

In the first trial, jury selection began on December 11, 2012, before Chief Judge Roslyn O. Silver, but visiting District Judge Jack Zouhary presided over the trial itself. The trial began on January 2, 2013. On January 29, 2013, a mistrial was declared as the jury was unable to reach a unanimous verdict following 17 days of trial. (Docs. 1021, 1083)  Notably, near the beginning of trial, the District Court of Arizona's assigned PTS officer provided the parties and Judge Zouhary with a confidential, sealed status report, indicating Defendant "has done well during his term of Pretrial Services supervision . . . has reported as directed, and no violations have been noted." (Doc. 1036)  "A record check conducted by Pretrial Services on December 28, 2012, was negative for any new arrests or warrants sustained by the defendant." (*Id*.) At that time, Pretrial Services "recommended the defendant be allowed to remain released under the previously imposed conditions." (*Id*.) After the mistrial was declared, the Western District of Texas' PTS officer resumed the courtesy supervision of Defendant pending the second trial. Jury selection for the second trial is currently scheduled

---

[2] There was a suggestion at the hearing that during the January 2013 trial in Phoenix while Defendant was temporarily staying with his father in Mesa, the Slade family moved to a different location in Austin and Defendant failed to disclose the move to his PTS officer. (Day 5, Tr. at 60, 63) Jennifer Slade explained she did not know if her husband would be coming home at the conclusion of the trial. When he did return after the mistrial was declared, they disclosed their move. (*Id*.)

to begin on June 6, 2013. (Doc. 1117)

On April 2, 2013, barely two months after the mistrial, a federal grand jury sitting in Phoenix returned a sealed, 47-count indictment against Defendant, the sole defendant, in CR-13-460-PHX-DGC (MHB), alleging probable cause exists for the crimes of Wire Fraud (Counts 1-39), Transactional Money Laundering (Counts 40-45), and Aggravated Identity Theft (Counts 46-47). (Doc. 1 in CR-13-460-PHX-DGC (MHB)) All of the crimes in this indictment are alleged to have been committed in 2008, well before Defendant was released on conditions on December 10, 2009 in the above-captioned case. Different CJA counsel was appointed to represent Defendant in this case at his May 10, 2013 initial appearance and arraignment in Phoenix.[3]

**II. The Petition**

On April 23, 2013, less than three months after the mistrial was declared in this case, the Government filed a 16-page *Ex Parte* Petition to Revoke [Defendant's Pretrial] Release Pending Trial ("the Petition"), alleging Defendant violated his pretrial release conditions by committing various crimes *before* and after he was released on conditions on December 10, 2009.[4] (Doc. 1211) Upon filing the Petition, the Government requested an arrest warrant,

---

[3] Because new defense counsel had just met Defendant and understandably was not ready for a contested detention hearing on May 14, 2013 in CR-13-460-PHX-DGC (MHB), and the parties elected not to continue the May 14, 2013 pretrial revocation hearing in CR-09-1492-PHX-ROS (MHB) for combined detention and pretrial revocation hearings on a later date in both cases, the parties stipulated on the record that if Defendant were released on conditions in CR-09-1492-PHX-ROS (DKD), the Government would not seek detention in CR-13-460-PHX-DGC (MHB), and if Defendant were detained in CR-09-1492-PHX-ROS (DKD), Defendant would waive his right to a detention hearing in CR-13-460-PHX-DGC (MHB) and submit the issue on the record in CR-09-1492-PHX-ROS (DKD) without a hearing. (Doc. 1248; day 1, transcript ("Tr.") at 4)

[4] The Court summarily rejected the Government's claim that 18 U.S.C. § 3148 authorizes the revocation of a defendant's pretrial release in one case for crimes allegedly committed before the defendant was placed on pretrial release in another case. The Government cites no authority to support, and the express terms of the statute reject, this specious argument. Thus, the Court gives no consideration to the Government's reference to criminal acts alleged in the Petition occurring before December 10, 2009, or the criminal

rather than a summons. Defendant was arrested on Tuesday, April 30, 2013, in Austin, Texas and detained. (Doc. 1237) Three days later, Defendant waived an identity hearing, reserved his right to a detention hearing in Phoenix, and remained temporarily detained pending a pretrial revocation hearing on the Petition, pursuant to 18 U.S.C. § 3148. (Doc. 1237-1 at 1)

Simply stated, the Petition claims Defendant defrauded a "vulnerable" 59 year-old woman, who "has been battling mental issues for most of her life," regarding pest control services and home repairs performed in September 2011 at her newly-purchased but older residence located in Lakeway, Texas. (Doc. 1211 at 4-5) The Petition alleged Defendant started a residential pest extermination business in Austin, Texas, based out of his home, called Eco Pest & Maintenance, Inc. ("Eco Pest Control"). (*Id*.) The Government contends the alleged victim, Jackie Green ("JG"), "was solicited by [Defendant's[5]] pest control business"[6] in late August 2011, and, "within a short period of time, [Defendant] defrauded JG in several different ways" and only stopped when JG's 19-year old daughter, Guiia Hosmer, reported Defendant's conduct to the Lakeway Police Department on September 29, 2011. (*Id*. at 5; *see* a partial police report, Exhibit ("Exh.") 17 at 5) On October 13, 2011, one of JG's caregivers, Kathryn Fender, told Defendant he was no longer welcome at JG's residence and he needed to leave when he stopped by JG's residence purportedly to check up on JG. (Exh. 17 at 6)

---

allegations that occurred entirely in 2008 raised in a 2013 indictment, CR-13-460-PHX-DGC (MHB).

[5] The evidence produced at the hearing indicated that, in September 2011, Jennifer Slade, Defendant's wife, and John Estrada owned Eco Pest Control, not Defendant. (Exhs. 17 at 5; 52, ¶ 2; ) Texas public records reflect Defendant had no formal ownership interest in Eco Pest Control except his undivided community property interest in his wife's ownership of Eco Pest Control. (*Id*.) It is clear, however, Defendant exercised significant control over Eco Pest Control and its employees during the relevant time in 2011.

[6] Though a collateral issue, Defendant refuted this claim at the hearing. Nancy Brown recommended Eco Pest Control to JG in August 2011 as Ms. Brown learned Carlye Donaldson, who previously had done work for Ms. Brown, was employed by Eco Pest Control at that time. (Exhs. 42, ¶¶ 1, 3; 2A)

According to the Government, JG suffers from Alzheimer's disease, who in August and September, 2011, lived by herself, but was frequently visited by a caregiver and relatives. (Doc. 1211 at 5) JG is the beneficiary of a trust established by JG's parents and held at Lubbock National Bank and controlled by her sister, Gail Fargason, as trustee. Once a month, $10,000 is distributed from the trust account at Lubbock National Bank to JG's Wells Fargo account. (*Id.*)

Generally, the Petition alleges Defendant committed four types of criminal acts on JG, the alleged victim: 1) charging for services that were never performed; 2) double charging for the same services; 3) unauthorized charging on JG's American Express card; and 4) taking advantage of a vulnerable victim for financial gain in return for essentially doing nothing for her. Specific examples of the Government's claims are: 1) Defendant convinced JG to pay him $487.00, in advance, for a year's worth of Eco Pest Control pest service, *see* Exh. A[7] to the Petition, but, despite being paid up for the year, Defendant separately billed JG on September 17, 2011 for an additional $1,623.75 for pest control services, *see* hearing Exh. 6; and 2) Defendant "fooled JG into signing a 'Limited Scope Service Agreement,' which paid [Defendant] a weekly fee for doing nothing, or the equivalent[,]" *see* hearing Exh. 8, which authorized payments to Defendant of "$5,000 per week for the first two weeks, and $2500 per week thereafter, to 'act as a liaison' between JG and the actual workers doing maintenance around JG's home." (Doc. 1211 at 5) "This weekly payment was in addition to the cost of actually doing the repair or maintenance work

---

[7] This exhibit was not introduced in evidence during the hearing, but the parties do not dispute the amount Eco Pest Control billed JG for this initial service and the annual pest control contract of $487.13, which Defendant claims was made in two payments: $162.38 and $324.75. (*See* hearing Exh. 2A, an original copy; doc. 1246 at 4) Special Agent Armstrong testified the full amount was charged to JG's credit card "a few weeks later." (Day 1, Tr. at 14) It is undisputed the annual pest Service Agreement was signed on August 29, 2011, by Nancy Brown, JG's cousin, on behalf of JG, and Eco Pest Control employee, Carlye Donaldson. Defendant contends Ms. Brown was involved in JG's care and supervision and was frequently seen at JG's home while Eco Pest Control performed work at the residence. (Doc. 1246 at 3) There was no evidence Defendant had any contact or dealings with JG regarding the annual pest Service Agreement.

on the home." (*Id.* at 6) "Within the Slade-created contract, [Defendant] limited his responsibility by having no authority over the workers hired, the work performed, the quality of the work performed, or the payment for any work." (*Id.*)  The Government described the terms of the Limited Scope Service Agreement as "ridiculous" and only a mentally incompetent person would agree to such a one-sided contract. (Day 5, Tr. at 69) It is undisputed Defendant obtained a check, No. 1106, dated and cashed on September 8, 2011, made payable to cash for $5,000 and drawn on JG's checking account with Wells Fargo Bank, *see* hearing Exhs. 9; 33 at 3, and another check, No. 1114, dated and cashed on September 30, 2011, made payable to "Dwayne [sic] Slade"[8] in the amount of $2,500.00 drawn on the same bank account, *see* hearing Exhs. 16; 33 at 8.

On May 13, 2013, the day before the pretrial revocation hearing began, Defendant filed an 18-page Response to the Petition, denying, *inter alia*, Defendant "solicited" JG for the work performed at her residence, denying the numerous allegations of criminal conduct, and denying the Government's claim Defendant was aware JG was bipolar and suffering from Alzheimer's disease. He claims "[h]e had no reason to know that she had mental issues when they entered into a business relationship." (Doc. 1246 at 3-4) Defendant contends the Government has "misrepresented and/or exaggerated the facts associated with the Ms. Green matter . . . [and] almost solely relies on the statements of Ms. Green's daughter, Guiia Hosmer, a person who was not involved in the parties' business relationship and has little to no evidence to support her accusations[.]"[9] (*Id.* at 2) He points out he voluntarily participated in the Lakeway Police Department's investigation, submitted to a police interview, and gave the police his job file for JG's home. (*Id.* at 3)

Defendant characterizes the Limited Scope Service Agreement ("Service Agreement"), *see* hearing Exh. 8, as a contract similar to one between a property owner and

---

[8] There was no satisfactory explanation at the hearing why Duane Slade's name was misspelled on this check.

[9] Carwin Slade testified he never saw or spoke with Ms. Hosmer the whole time he and his Eco Pest Control work crew were working at JG's home. (Day 4, Tr. at 51)

a general contractor. "General contractors get paid for coordinating the subcontractors and ensuring that the work contracted for gets done on time." (*Id*. at 9) Regardless of how the Government labels the Service Agreement, he notes the Lakeway Police Department's report closing its 2012 investigation into Defendant's conduct *vis a vis* JG "as unfounded" because "it [is not] against the law to overcharge someone." (*Id.* at 3; hearing Exh. 17 at 5) According to this Lakeway Police report, Officer Mike Pribble informed JG's daughter, Ms. Hosmer, "[t]here was nothing we could do because there wasn't an offense."[10]

The two-page Service Agreement indicates it was between Jackie Green and Duane Slade, not Eco Pest Control, and is dated September 8, 2011. (*See* hearing Exh. 8)  Omitting the itemized agreed-upon work to be performed at JG's residence and the clauses addressing communications, mediation, and future work, the Service Agreement provides:

> It is agreed that Duane Slade (Duane) will assist Jackie Green (Jackie) in finishing certain jobs as outlined below for a fee. Duane agrees to set up and manage on a day to day basis the work described in paragraph A of this agreement. Jackie agrees to pay Duane *each week* a management fee as described in paragraph B of this agreement. Duane is not responsible for the quality of work and does not warranty or guarantee any of the workmanship personally. Duane agrees to manage the workers that Jackie hires. Duane will not be responsible to make any decisions concerning the workers hired, the jobs to be completed, or the order in which they are done. Duane will simply follow and carry out the directions from Jackie. Duane agrees to act as a liaison between Jackie and any workers that are performing the actual labor on Jackie's residence. Though Duane may add input, Jackie will have the final say and responsibility on any work to be done.  *This agreement shall last a minimum of three weeks*, but may be extended if both parties agree.
>
> *       *       *       *       *       *
>
> B.  Payment/Fees
> Jackie agrees to pay anyone that she hires and approves the work for, directly as agreed to with each person performing the work. Duane will not be responsible

---

[10] Apparently, the Lakeway Police reopened its investigation against Defendant on October 18, 2011, when Ms. Hosmer submitted new information. (*See* hearing Exh. 17 at 5) The Government, however, only introduced two pages of the report at the hearing so what the Lakeway Police investigation revealed after November 17, 2011 is unknown to the Court. (*Id.* at 5-6) According to the Defendant, "the Lakeway Police Department is reopening the investigation at the United States' behest, not as a result of new evidence. All the evidence available now, was available in 2011-2012 and was provided to the police." (Doc. 1246 at 3)

in any way for the payment on any of these jobs or other jobs performed under this agreement. *Duane will manage all of these jobs for a fee of $5000.00 the first week, $5,000.00 the second week, and $2500 each week there after until the work is completed. This is considered a management fee and will be paid each Thursday beginning September 8, 2011.* This fee does not guarantee the quality of any work performed. This fee is paid to assist Jackie in work that she has requested to be done at her property. Duane agrees to do his very best to ensure that all work is completed in a timely manner and that all work is done as agreed upon. Duane does not guarantee any of the work and it is understood by Jackie and Duane that this is a best efforts agreement. If any of the work is not completed for any reason Duane will not be held responsible in any way. Duane will do his best to ensure that all work is completed as agreed upon and that Jackie's interests are protected throughout this agreement period. *If at anytime Jackie fails to pay the agreed upon amounts to the workers or to Duane, this agreement is considered breached and Duane has the right at his discretion to terminate this agreement.*

\*          \*          \*          \*          \*          \*

(*Id.*) (emphasis added)  Though the copy of the Service Agreement received in evidence at the hearing does not bear the signature of either Defendant or JG, and contains the handwritten note, "Customer has signed copies," Special Agent Armstrong testified "it was signed by Mr. Slade and Ms. Green."  (Day 1, Tr. at 18)

**III. Pretrial Revocation**

Pursuant to 18 U.S.C. § 3148, the Petition alleges Defendant violated term one of his release conditions that he "[n]ot violate any federal, state, or local law while on release." (Doc. 44 at 1)  The Petition does not claim Defendant violated any other pretrial release condition.[11]  Specifically, the Petition alleges probable cause exists "Defendant committed a federal felony in violation of Title 18 U.S.C. §§ 1029(a)(2) (access device fraud) and 1343 (wire fraud)." (Doc. 1211 at 4 n. 5) The Petition also alleges "there is probable cause that Defendant committed theft in the state of Texas." (*Id.*) (citing Tex. Penal Code § 31.16, Attachment 1).[12]

---

[11] The Government does not dispute Defendant appeared at every trial day or other court proceeding when required to do so, and, therefore, Defendant's risk of flight pending trial was a non-issue at the hearing.

[12] The Government initially argued during the hearing Defendant intentionally provided false information ("lie[d]") to Texas police officers when he was interviewed by the Lakeway Police Department on April 24, 2012. (Doc. 1211 at 8) Under Texas law, "[a]

Title 18 U.S.C. § 3148 governs pretrial revocation and detention based on a violation of pretrial release conditions. *See United States v. Reynolds*, 956 F.2d 192-193 (9th Cir. 1992) (ruling in a bail hearing pending appeal and a violation of pretrial release condition); *United States v. LaFontaine*, 210 F.3d 125 (2d Cir. 2000); *United States v. Aron*, 904 F.2d 221, 224 (5th Cir. 1990) ("[A] district court's finding that a defendant will not abide by any conditions of release may be established by a preponderance of the evidence."). "If a condition of pretrial release is violated, a request to revoke is heard under 18 U.S.C. § 3148, not section 3142." *United States v. Bararia*, 2012 WL 5453673, at *4 (D. Nev. Nov. 7, 2012) (citation omitted). "The standards under the two sections are markedly different." *Id.*

Pursuant to 18 U.S.C. § 3148, "[a] person who has been released under section 3142 . . . and who has violated a condition of his release, is subject to revocation of release[.]" 18 U.S.C. § 3148(a). Section 3148(b) further provides in relevant part that:

> [T]he judicial officer shall enter an order of revocation and detention if, after a hearing, the judicial officer
>
> (1) finds that there is-
>
>> (A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; . . .
>>
>> [and]
>>
>> (B) the person is unlikely to abide by any condition or combination of conditions of release.
>
> If there is probable cause to believe that, while on release, the person committed a Federal, State, or local felony, a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community. If the judicial officer finds that there are conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community, and that the person will abide by such conditions, the judicial officer shall treat the person in accordance with the provisions of section 3142 of this title and may amend the conditions of release accordingly.

---

person commits a Class B misdemeanor if, with intent to deceive, he knowingly makes a false statement that is material to a criminal investigation and makes the statement to a peace officer conducting the investigation." *Rotenberry v. State*, 245 S.W.3d 583, 587 (citing Tex. App. 2007) (Tex. Penal Code Ann. § 37.08 (Vernon 2003)). On May 20, 2013 in open court, the Government withdrew this claim as a ground for revoking Defendant's pretrial release.

18 U.S.C. § 3148. "Unlike § 3142(f), there is no limitation in § 3148(b) regarding the types or categories of Federal, State, or local crimes that will support an order revoking pretrial release." *United States v. Soria*, 2011 WL 3651272, at *6 (D. Nev. Aug. 17, 2011) (citing *United States v. Gill*, 2008 WL 2120069 (E.D. Cal. 2008) (holding second wire fraud indictment against defendant for conduct allegedly performed during the pendency of the first wire fraud indictment provided the requisite probable cause to revoke the defendant's pretrial release and detention pursuant to § 3148(b)(1)(A) as an economic danger to the community). "Courts have long recognized that 'danger' in the context of § 3148 refers to unlawful conduct, with little distinction between whether the nature of the conduct is economic or physical." *United States v. Wong*, 2012 WL 5464178, at *4 (D. Haw. Nov. 8, 2012) (citing *United States v. Reynolds*, 956 F.2d 192, 192-93 (9th Cir. 1992)) ("We further hold that danger may, at least in some cases, encompass pecuniary or economic harm.") (citation omitted).

While Section 3148 does not define "probable cause," district and circuit courts have concluded that "[p]robable cause under section 3148(b)(1)(A) requires only that the facts available to the judicial officer 'warrant a [person] of reasonable caution in the belief' that the defendant has committed a crime while on bail." *Wong*, 2012 WL 5464178, at *3 (quoting *United States v. Gotti*, 794 F.2d 773, 777 (2d Cir. 1986) ("This scheme indicates that where there is probable cause to believe the released defendant has committed a crime, he may thereafter be detained upon a finding, by only a preponderance of the evidence, that no conditions of release will guard against flight or dangerousness or that the person is unlikely to abide by any release condition.") (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)). "[P]robable cause is a fluid concept - turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Under the Supreme Court's "totality-of-the-circumstances" approach, probable cause deals "[a]s the very name implies, . . .with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 231.

1    "In drafting the Bail Reform Act, Congress considered 'probable cause' to be a less

2    demanding standard than that of 'substantial probability.'" *Wong*, 2012 WL 5464178, at *3

3    (citing *United States v. Contreras*, 776 F.2d 51, 53 (2d Cir. 1985)).

4          The Bail Reform Act of 1984 expressly provides that the Federal Rules of Evidence

5    do not apply in detention hearings. *See* 18 U.S.C. 3142(f)(2)(B) ("[T]he rules concerning

6    admissibility of evidence in criminal trials do not apply to the presentation and consideration

7    of information at the hearing[.]"). "[I]n the pre-trial context, few detention hearings involve

8    live testimony or cross examination [sic]. Most proceed on proffers . . . This is because bail

9    hearings are typically informal affairs, not substitutes for trial or discovery[.]" *United States*

10   *v. Abuhamra*, 389 F.3d 309, 320 n. 7 (2d Cir. 2004) (citations and internal quotation marks

11   omitted). It is undisputed that a judge may consider hearsay statements in determining

12   whether there is probable cause to believe a person has committed a crime while on pretrial

13   release. *Bararia*, 2012 WL 5453673, at *5 (citing *United States v. Castillo*, 866 F.2d 1071,

14   1077 (9th Cir. 1988)). According to the district court in *Gil*, "[e]very circuit to weigh in on

15   the issue of what establishes probable cause has held that an indictment is sufficient to

16   establish the probable cause necessary." *Gil*, 2008 WL 2120069, at *2 (citations omitted).

17   "While the cited cases in the preceding sentence arose under the initial detention proceedings

18   statute, 18 U.S.C. § 3142 (the most often litigated issues are litigated under this section),

19   there is no law or logic which would weigh in favor of a different indictment use

20   interpretation for statutes which appear in the same statutory chapter." *Id.*

21         There is no evidence Defendant has been charged with a crime in Texas, let alone

22   indicted, for any criminal conduct allegedly occurring in September and October 2011. The

23   Court must therefore determine whether the Government presented sufficient evidence at the

24   revocation hearing to support a finding of probable cause to believe that Defendant has

25   committed a Federal, State or local crime while on pretrial release.

26   **IV. The Crimes**

27        **A. Access Device Fraud**

28         The elements of the crime of Access Device Fraud, in violation of 18 U.S.C. §

1029(a)(2),[13] are: 1) defendant knowingly used an unauthorized access device at any time during a one-year period; 2) by using the unauthorized access device during that period, defendant obtained things of value, their value together totaling $1,000 or more during that period; 3) defendant acted with the intent to defraud; and 4) defendant's conduct in some way affected interstate or foreign commerce. *See United States v. Hanson*, 2009 WL 2460887, at *3 (C.D. Cal. Aug. 6, 2009) (citing Ninth Cir. Model Crim. Jury Instr. No. 8.69 (2003)). An "access device" means "any card, plate, code, account number . . . or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument)." 18 U.S.C. § 1029(e)(1). An access device is "unauthorized" if it "[r]evoked, canceled, or obtained with intent to defraud." 18 U.S.C. § 1029(e)(3).

**B. Wire Fraud**

The elements of the crime of wire fraud, in violation of 18 U.S.C. § 1343,[14] are: 1) the existence of a scheme to defraud; 2) the use of wire, radio, or television to further the scheme; and 3) a specific intent to defraud. *See United States v. Jinian*, 712 F.3d 1255, __ (9th Cir. 2013) (citing *United States v. Pelisamen*, 641 F.3d 399, 409 (9th Cir. 2011)). "Section 1343, however, does not purport to reach all frauds, but only those limited instances

---

13

"Whoever . . . knowingly and with the intent to defraud traffics in or uses one or more unauthorized access device during any one year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period ... shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section."

Title 18 U.S.C. § 1029(a)(2).

14

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, . . . in interstate or foreign commerce, . . . shall be fined under this title or imprisoned not more than 20 years, or both. . . ."

Title 18 U.S.C. § 1343.

wherein use of a wire "is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Id.* (citation and internal quotation marks omitted). "A wire communication is 'in furtherance' of a fraudulent scheme if it is 'incident to the execution of the scheme,' *United States v. Lo*, 231 F.3d 471, 478 (9th Cir. 2000), meaning that it 'need not be an essential element of the scheme, just a 'step in the plot[.]''" *Id.* (citation omitted). Intent to defraud "[m]eans to 'wrong[ ] one in [her] property rights by dishonest methods or schemes, and usually signif[ies] the deprivation of something of value by trick, deceit, chicane or overreaching.'" *United States v. Treadwell*, 593 F.3d 990, 996 (9th Cir. 2010) (quoting *Carpenter v. United States*, 484 U.S. 19, 27 (1987)). "Section 1343 has been interpreted broadly, and the Supreme Court has held that 'individuals who retain or misappropriate the money . . . of others, regardless of how they acquired it, fall within the purview of mail or wire fraud.'" *United States v. Siddiqui*, 2010 WL 3835604, at *4 (N.D. Cal. Sept. 28, 2010) (quoting *United States v. Jones*, 472 F.3d 1136, 1139 (9th Cir. 2007)). "Intent to defraud 'may be established by circumstantial evidence,' *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003), and the scheme itself may be probative circumstantial evidence." *Id.* (citing *United States v. Plache*, 913 F.2d 1375, 1381 (9th Cir. 1990)). "Intent also may be inferred from misrepresentations made by the defendants. *Id.* (citing *United States v. Lothian*, 976 F.2d 1257, 1267-68 (9th Cir. 1992)). "[T]he intended deprivation under § 1343 need not be a permanent 'taking away' of money or property. One can intentionally 'deprive' another of property while at the same time intending to restore it at a later date." *Treadwell*, 593 F.3d at 996.

### C. Theft in the State of Texas

Theft under Texas law "occurs when (1) property is (2) unlawfully appropriated (3) by someone (4) with intent to deprive the owner of that property." *Anderson v. State*, 322 S.W.3d 401, 407 (Tex. App. 2010) (citing Tex. Penal Code Ann. § 31.03). "The Texas Penal Code allows multiple thefts committed pursuant to one scheme or continuing course of conduct—at different times and against different victims—to aggregate within one offense for purposes of the offense grade." *Id.* at 407-08 (citing Tex. Penal Code Ann. § 31.09). "A

theft is complete when all the elements have occurred." *Id*. at 408 (citation omitted). "Theft is not a continuing offense—it does not continue as long as the actor retains control of the stolen property." *Id*. (citation omitted).

**V. The Hearing**

The pretrial revocation hearing spanned nine days with testimony taken over portions of five days, beginning on May 14 (Day 1) and concluding on May 24, 2013 (Day 5).[15] The Government called one witness, FBI Special Agent Kyle Armstrong, the primary FBI agent on the above-captioned case and the assigned agent on the newest case, CR-13-460-PHX-DGC (MHB). (Day 1, Tr. at 12)  As authorized by federal law, his testimony was entirely hearsay. The challenge for the Court in this complicated pretrial revocation hearing is determining the reliability of the testimony, the proffers, and evidence presented without conducting a full-blown trial to achieve a fair and just result.

In January 2013, Special Agent Armstrong and other investigators in his office discovered the complaint about Defendant made by Ms. Hosmer to the Lakeway Police Department and the fraud report made by American Express so they called JG's daughter, Ms. Hosmer, and obtained the Lakeway Police reports. (*Id*. at 13-14) He testified that about ten days after the August 29, 2011 Service Agreement was signed, *see* hearing Exh. 2A,[16] there were additional charges for $1,623.75 and $893.06 for pest control services. (*Id*. at 16; hearing Exh. 6) According to Special Agent Armstrong, "Ms. Hosmer thinks that a majority of the writing overall on the[se] checks was not her mother's, and, in  fact, none of the signatures she claimed were her mother's." (*Id*. at 21)

One of the most hotly contested issues in this hearing was the obviousness of JG's

---

[15] The other hearing days were May 16 (Day 2), May 17 (Day 3), and May 20 (Day 4). (Docs. 1258, 1262, 1269) While most pretrial revocation hearings are much shorter, the disputed claims raised in the Petition, the complexity of the issues, the numerous documents involved, and the interests of justice dictated the parties be given more time to fairly present the claims and defenses.

[16] The Government is not claiming that the initial work done by Eco Pest Control, as authorized by Exhibit 2A, is a ground upon which the Government seeks Defendant's pretrial revocation and detention. (Day 5, Tr. at 64)

mental health from August 29, 2011 to September 12, 2011. Without the benefit of reviewing and disclosing any of JG's medical or psychiatric records, Special Agent Armstrong testified JG "has serious mental-health issues; that she's been in and out of psychiatric wards for several years; she's diagnosed with bipolar, Alzheimer's, and potentially, Schizophrenia, and . . . *during a majority of this work, [JG] was in and out of psychiatric wards*." (Day 1, Tr. at 19) (emphasis added). The source of this information did not come from JG because Special Agent Armstrong testified that he called JG sometime shortly before the Petition was filed and "she was very confused . . . [and we] could tell that she wasn't going to be helpful to [us] because of her issues with Alzheimer's." (Day 4, Tr. at 20-21) Thus, the source of this information about JG's mental health in September 2011 is from Ms. Hosmer, Nancy Brown, or others clearly adverse to Defendant. Special Agent Armstrong's testimony, however, that, "[o]n September 12, 2011, [JG] was institutionalized in a local psychiatric hospital for approximately, I think, a couple weeks[]" was corroborated at the hearing by Carwin Slade.

Special Agent Armstrong testified that, on September 14, 2011, two days after JG was admitted to a psychiatric hospital, there was a $5,553.23 charge on JG's American Express credit card. (Day 1, Tr. at 22; hearing Exh. 14) An invoice itemizes repair work purportedly performed at JG's residence, is dated, and was submitted on, September 14, 2011, two days after JG was hospitalized when she was physically absent from her residence. (*See* hearing Exh. 14) He testified $5,553.23 was "charged to her credit card while she's in a mental institution." (Day 1, Tr. at 22-23)

The only witness Defendant called to testify was Carwin Slade, Defendant's father. Unlike the Government's only witness, Carwin Slade has personal knowledge of the repair and maintenance services performed at JG's residence, Day 4, Tr. at 51, and personally interacted with JG at her residence before she was hospitalized on September 12, 2011.

Living in the Austin area at the time, Carwin Slade had 35 years of experience as a general contractor and was working for Eco Pest Control in September 2011. (Day 4, Tr. at 35-36) He ran Eco Pest Control's work crew at JG's residence and described the significant

repairs and other work performed at JG's home. (*Id.* at 36-37, 42-46) Suffice it to say that Carwin Slade's testimony sufficiently refuted the Government's claims there were criminal wrongdoings by Eco Pest Control for duplications of pest control services, charges for home repair services that were allegedly not performed, and the billings for such services at JG's residence. His overall testimony removes these issues out of the criminal realm to a civil one for resolution of these disputes between JG, or her legal representative, and Eco Pest Control in a civil lawsuit. For example, he confirms that he and his work team performed the work described on Exhibit 4 and that JG signed the invoice, neither he nor Eco Pest Control charged her for work that was not performed, but he denies he made all the "modifications" on the invoice. (*Id.* at 47-48, 50)

Carwin Slade testified JG presented some challenges which may have affected the repair costs and invoice changes as she

> [c]hanged her mind a lot. She wasn't ever really dissatisfied with anything. But sometimes we wouldn't even get started on a job, and she'd have a different idea. I spent probably two hours every morning with her just going over changes, a lot of time, very time consuming. She remembered everything we were talking about, but she just couldn't make up her mind what she wanted sometimes.

(*Id.* at 46)  Despite daily contact with JG and having familiarity with Alzheimer's disease because he has a family member afflicted with it, he did not know she had Alzheimer's or was bipolar. (*Id.* at 50-51) "She remembered everything we talked about . . . Ms. Green could remember things that had happened, say, the day before . . . [or the previous] week. . . I wasn't positive she had mental issues. She was getting older. She was a little different. I've worked for a lot of people that were different that were indecisive, but that's all I found wrong with her." (*Id.*) He testified he was not aware of anyone at Eco Pest Control who knew she had Alzheimer's or was developing Alzheimer's at that time.  (*Id.* at 51)

The testimony of Carwin Slade is corroborated by the affidavit of former Eco Pest Control employee, Carlye Donaldson. (*See* hearing Exh. 42) Mr. Donaldson, who had sufficient direct contact with JG to have personal knowledge of her demeanor, averred that Nancy Brown told him JG was "a little off," but "the degree of her mental illness was not readily apparent to [him]." (*Id.*, ¶ 4 at 1)  The Government's picture of JG as a helpless,

vulnerable victim with Alzheimer's disease is a far cry from that described by Carwin Slade and Carlye Donaldson, who described JG as a rude and demanding screamer and user of profanity. (*Id.*, ¶ 6 at 2)

Significantly, Carwin Slade testified that, while he doesn't remember the exact date, when JG went to the hospital, "I know we pulled off the job when she went to the hospital." (Day 4, Tr. at 31) Her assistant or housekeeper told them when "[w]e showed up this morning and . . . said she was in the hospital and . . . they didn't want us to work anymore until she got out." (*Id.* at 32) Mr. Slade has no recollection of Eco Pest Control, his son, himself, or his work crew doing any more home repairs or other services for JG after JG was hospitalized and he and his crew were pulled off her job. (*Id.*)  He admits he was aware his son was paid $2,500 for "overseeing" his work at the end of September of 2011, because Defendant told him, but he does not recall any of the details of this conversation. (*Id.* at 33) It is undisputed that, while there may have been plans to do more repair work at her home, no services were performed at JG's residence after September 12, 2011 by Eco Pest Control, Carwin Slade, or Carwin Slade's work crew.

**VI. Discussion**

On August 29, 2011, JG's home was infested with insects, fleas, ticks, and roaches. JG had five or six dogs that contributed to the flea and tick infestation. (Day 4, Tr. at 24) Her home genuinely needed pest treatments, and, as an older home, it also required repairs and maintenance. (*See* hearing Exhs. 2A, 6, 42, and 50) Eco Pest Control performed an initial treatment and additional pest control services not covered by the annual service contract. The evidence does not support the Government's claims that the services performed by Eco Pest Control and Carwin Slade in early September 2011 were not required or not approved by JG or one of several representatives who claimed to act on her behalf, but lacked the lawful authority to do so,[17] or that Eco Pest Control or Defendant double charged JG for the same

---

[17] No evidence was presented that JG's daughter, cousin, caregivers, or trustee had JG's general power of attorney or was lawfully appointed as JG's guardian or conservator under Texas law in September 2011. Moreover, without a copy of the trust document in evidence outlining the powers of JG's trustee, the Court will not assume the trustee was

work.[18] No handwriting expert was presented to clarify the numerous adverse lay opinions of who wrote on, endorsed, or signed the various checks drawn on JG's checking account and invoices received in evidence.[19] The Government conceded that important exhibits in this hearing, Exhibits 5, 9, and 16 - all checks, have different handwriting on them and none of the signatures purportedly match JG's signature. This inadequacy in the proof is construed against the Government in meeting its burden of proof regarding the checks and invoices generated in September 2011.

An important and representative invoice is Exhibit 4, dated September 7, 2011 and bears Carwin Slade's first name, reflects several possibilities: 1) extremely sloppy record keeping for a business dealing directly with the public, 2) a poor substitute for a change order for a client like JG who frequently changed her mind on the work she wanted, or 3) an attempt by an unknown person with access to Eco Pest Control's file to after-the-fact alter ("doctor") the itemized charges on the invoice to correspond with Defendant's September 12, 2011 e-mail to Lubbock National Bank, requesting payment of $5,130. (*See* hearing Exh. 13) It is obvious the invoice has been altered to change two amounts from $200 entries into $1,200 entries by adding a "1" before each number. A "2" was then placed before the original $250 entry to make it now "$2,250." (*See* hearing Exh. 4) Then, two days later, purportedly on September 14, 2011, someone at Eco Pest Control generated Invoice # 4647, itemizing the work that was allegedly completed at JG's residence on "Service Date

_____

empowered to make all decisions involving JG.

[18] The Government's flawed premise throughout this hearing is its implied claim that Defendant is criminally responsible for everything Eco Pest Control did or failed to do for JG at her residence on or before September 12, 2011. Even Special Agent Armstrong conceded the FBI had no evidence of Defendant's ownership in Eco Pest Control "[o]ther than his community one-half interest in whatever [his wife] owned at the time[.]" (Day 4, Tr. at 23)

[19] For example, Jennifer Slade avers that Exhibit 16, the $2,500 check that misspells her husband's name, does not contain her husband's handwriting on the check, with the exception of Defendant's signature on the back endorsing the check. (*See* hearing Exh. 2, ¶ 4 at 1)

9/14/2011," in the total amount of $5,553.23, but it's for the same work itemized in Defendant's September 12, 2011 e-mail and for the same amount except $423.23 is added in sales tax which was not included in Defendant's e-mail. (*See* hearing Exh. 14)

Regardless whether these invoices are examples of sloppy business practices or attempts to defraud JG, it is undisputed that JG was in a psychiatric hospital from September 12, 2011 to September 23, 2011, when someone at Eco Pest Control charged $5,553.23 on JG's American Express credit card on September 14, 2011. (*See* hearing Exh. 7 at 3) The Government argues that when the Lubbock National Bank did not approve payment from JG's checking account after Defendant's September 12, 2011 e-mail, on September 14, 2011, Defendant "fraudulently charged JG's American Express credit card without authority for $5553.23 [$5,130.00 plus 8.25% tax]." (Doc. 1211 at 7) (citing hearing Exh. 7 at 3).

Defendant disputes the Government's and Ms. Hosmer's claim Eco Pest Control did not have JG's authority through Nancy Brown, JG's cousin, to charge the payment for Eco Pest Control's and Carwin Slade's services on JG's American Express credit card. (*See* Exh. 40, ¶ 6 in which Jennifer Slade avers "[N]ancy Brown provided Jackie Green's American Express credit card number to Eco Pest Control and authorized the company to use the card [number.]")  Hearing Exhibit 7 confirms there were five prior charges to JG's credit card by Eco Pest Control on September 8 and September 9, 2011, all before the most controversial charge on September 14, 2011, in the amount of $5,553.23. (*See* hearing Exh. 7 at 2-3)

**VII. Findings**

Based on the testimony, evidence, and arguments presented, the Court finds as follows:

1. The Government failed to establish that probable cause exists that Defendant charged JG with multiple billings and received duplicative payments for the same pest control services and home repairs performed on August 29, September 7 and 8, 2011. (*See* hearing Exhs. 2A, 5 and 6)

2. The Government failed to establish that probable cause exists that Defendant knew or should have known that Jackie Green was not mentally competent prior to her

hospitalization on September 12, 2011.

3. The Government failed to establish that probable cause exists that Jackie Green did not agree to the September 8, 2011 Service Agreement with Defendant.

4. The Government failed to establish that probable cause exists that Defendant wrongfully and without Jackie Green's express or implied authority charged $5,553.23 to JG's American Express credit card on September 14, 2011, and Defendant was the one that made the charge. On the evidence presented, it is just as likely Jennifer Slade conducted the credit card transaction on September 14, 2011 as Defendant.

5. The Government proved, however, that probable cause exists that Defendant knew Jackie Green was not mentally competent on and immediately after September 12, 2011 when Jackie Green was hospitalized in a psychiatric facility and Carwin Slade and his Eco Pest Control crew were pulled off the job on September 12, 2011 and never returned. Defendant's claim he thought she was on vacation is not credible.

6. The Government proved that probable cause exists that Defendant committed the crime of theft under Texas law, Tex. Penal Code § 31.16, while he was on pretrial release, based on his acts of charging Jackie Green and taking a $2,500 fee on September 30, 2011, *see* Exh. 16, after she was hospitalized on September 12, 2011 for mental disorders, without the express consent of Jackie Green's trustee, or other person acting on her behalf and authorized to do so under Texas law. The September 8, 2011 Service Agreement does not expressly authorize a weekly fee be paid to Defendant when no repair services were performed on Jackie Green's residence that week.

5. The Government proved that, in light of specific examples of Defendant's history of dishonesty and untrustworthiness established during this hearing, it is not likely Defendant will abide by all conditions of pretrial release pending trial if released.

Based on the foregoing,

**IT IS ORDERED** that the Government's *Ex Parte* Petition to Revoke [Defendant's Pretrial] Release Pending Trial, doc. 1211, is **GRANTED**. Defendant Duane Hamblin Slade shall be, and remain, **DETAINED** until further order of the assigned District Judge.

1   **IT IS FURTHER ORDERED** kindly directing the Clerk of Court to provide a

2   complete copy of this Order to all counsel of record in CR-13-460-PHX-DGC (MHB).

3   Dated this 5th day of June, 2013.

4

5

6   Lawrence O. Anderson
    United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28